# JOHN JACKSON *against* THE NEW YORK INSURANCE COMPANY.

A vessel belonging to A. who was a natural born citizen of the United States, was insured, by a policy, dated the first of November, 1796, on a voyage from New York to London; and was *warranted* American property. Afterwards, and before the vessel actually sailed on the voyage insured, viz. on the 27th of April, 1797, A. sold and transferred the vessel to B. a native of Great Britain, who had emigrated to New York, and become a naturalized citizen of the United States, on the 6th of April, 1797. The vessel having been captued by the French, and condemned as good prize ; it was held, in an action on the policy, that B. was to be considered as having emigrated, *flagrante bello*, and a British subject, so as to justify the condemnation ; and that A. having by his own act, before the commencement of the risk, changed the property from neutral to belligerent, there was a breach of the warranty.(a)

---

(a)-See *Duguet* v. *Rhinelander*, *infra*, 476; Caines' Cas. in Err. xxix, where this principle is reversed. S. C. *supra*, vol.1, p. 360.

THIS was an action on a policy of insurance, on the ship Oneida, from New York to London, warranted American property, proof of which, if required, to be made in New York. The policy was dated the 1st of November, 1796, when the ship was owned by the plaintiff, a natural born citizen of the United States. Afterwards, on the 29th of April, 1797, and before the vessel sailed on the voyage insured, the plaintiff sold and transferred her to James Jackson, a British subject; but who became a naturalized citizen of the United States on the 6th of April, 1797. The Oneida set sail from New York on the 3d of May, 1797, and was captured on the 25th of the same month, by a French privateer, and carried into Nantz, and there condemned. The [*192] grounds of *the condemnation as they appeared from the *procès verbal*, were:

1. The want of a *role d'equipage*, as required by the French regulations of 1704, 1744 and 1778:

2. That the manifest was not signed by a public officer:

3. That James Jackson confessed himself to have been born in England, and did prove his naturalization in the United States.

The principal reason, however, was the want of a *role d' equipage*, and the court adjudged " the ship good prize, as belonging to the enemies of the republic, for want of regularity in the sea papers."

The sentence of condemnation was confirmed on an appeal. The ship was duly abandoned to the defendants.

At the trial, at the November circuit, 1799, in New York, a verdict was taken for the plaintiff, subject to the opinion of the court on a case containing the above facts.

*Hamilton, Riggs* and *Evertson*, for the plaintiff.

*B. Livingston* and *Burr* for the defendants.

RADCLIFF, J. 1. It is sufficient to decide this case, that the plaintiff has not maintained his warranty, according to the principles already determined on this subject. (1 Johns. Cas. 16, 341, 360.) But,

2. Here was a transfer of the property, subsequent to the insurance, to one, who in view of the belligerent parties was

not entitled to be regarded as a neutral.    James Jackson emigrated *flagrante bello ;* and we have already decided, (1 Johns. Cas. 360 ;)(*a*) that no citizen or subject of either of the parties at war, can change his allegiance, so far as to alter *with respect to them, the relation in which he     [*193] stood at the commencement of the war.    The French had, therefore, a right to consider him as a British subject; and the ship, after being transferred to him, was liable to seizure and condemnation by them, as enemy's property.    The risk, therefore, was essentially altered and increased ; and the plaintiff, by the transfer, voluntarily destroyed the neutrality which he had guarantied to maintain.    The plaintiff, therefore, cannot recover on the policy, but as he has not committed any actual fraud, and the risk never commenced, he is entitled to a return of premium, on the principle adopted in several cases, (1 Johns. Cas. 310,)(*b*) already decided in this court.

KENT, J.    This cause offers two points for our consideration :

1. What effect, if any, is the sale of the ship to James Jackson to have upon the policy ?

2. If none, then is there the requisite evidence of a breach of the warranty ?

1. The policy was subscribed in November; and in the April following, and previous to the sailing of the ship, the plaintiff sold her to James Jackson.    He was born a British subject, and was naturalized on the 7th of April, 1797.    How long previous thereto, James Jackson had fixed his domicil in this country, does not appear.    The act of Congress, of the 27th of March, 1790, required only a previous residence of two years.    The act of Congress, of the 29th of January, 1795, enlarged the term of residence to five years, but provided that the enlargement of the term should not apply to aliens then resident within the United States.    As James Jackson was naturalized within two years and three months from the time of passing the last act, the naturalization is

(*a*) But see 1 Caines' Cas. in Err. xxv.          (*b*) And see 313, n. (*a*).

proof of his residence here in January, 1795 ; but it is no evidence of any previous residence.   The presumption
[*194]    *antecedent to that time must be, that he resided under the jurisdiction of the king of Great Britain, as every person's domicil must be presumed, until the contrary be shown, to be in the country where he was born, and to which he owes his native allegiance.   In January, 1795, the war between Great Britain and France had already existed for two years, and James Jackson is accordingly to be considered as changing his domicil, and emigrating, *flagrante bello.*

This natural, and as it appears to me, legal presumption, is strengthened by this further consideration, that we are to conclude, from the fact of his subsequent naturalization, that James Jackson came to this country with a view of becoming a citizen ; and in that case, that he would not have postponed the solemnity, for any considerable time beyond the period prescribed by law ; and if he had in fact fixed his residence here before the commencement of the war, he was entitled to the privilege of naturalization two years, at least, before he actually obtained it.

The case of *Duguet* v. *Rhinelander*, (1 Johns. Cas. 360 ;)(a) is in point.   The plaintiff there was a Frenchman by birth, and was naturalized here the 11th of October, 1796; and there was no proof in the case of any previous residence.   The decision of the court, accordingly, went upon the ground of his emigration here during the war, and that he was, therefore, in the purview of the law of nations, to which the warranty had reference, still a Frenchman.

My conclusion then is, that the plaintiff did, by his own act, and without the assent of the insurer, (for none appears,) change the property which he had warranted neutral, into belligerent property ; and this too before the commencement of the risk.

Upon such an act, I have no difficulty in declaring what must be the result.   A warranty must be true at the com-

(a) But see 1 Caines' Cas. in Err. xxv.

mencement of the risk. (Doug. 732. *Eden* v. *\*Parkinson*, Park, 353.) This was not so; and [\*195] what renders the case the stronger, and would, perhaps, have been decisive, if done even after the risk begun, is that the property ceased to be neutral, by the act of the party himself. It would be against all rule and right for a party in such a case, to avail himself of a loss, the consequence of his own voluntary deed; and therefore, without having any reference to the sentence of condemnation, I think the plaintiff ought not to recover beyond the amount of his premium, subject to the deduction stipulated in the policy.

BENSON, J. was of the same opinion.

LEWIS, J. was absent.

LANSING, Ch. J. not having heard the argument, gave no opinion.

Judgment for the plaintiff, for a return of the premium only.(a)

(a) Upon the principle of this case Mr. Duer remarks: "In the United States, it appears to be settled law, that a native subject can not acquire a foreign domicil by an emigration from his own country, during the existence of hostilities, (*flagrante bello*,) so as to protect his trade during the war, either against the belligerent claims of his own country, or against those of a hostile power. *The Dos Hermanos*, 2 Wheat. 78. *Duguet* v. *Rhinelander*, 1 Johns. Cas. 360. *Jackson* v. *N. Y. Ins. Co.* 2 Johns. Cas. 191. Contra—*Duguet* v. *Rhinelander*, 1 Caines' Cas. in Err. xxv. S. C. 2 Johns. Cas. 476. Vattel, liv. 1, c. 19, liv. 2, c. 27. Grotius De Jur. Bel. ac Pac. liv. 2, c. 5, § 2. Puffendorf, Droit des Gens par Barbeyrac, liv. 8, c. 11, § 3. In other words, his native character is wholly unchanged by his change of residence. He is as much bound to abstain from a trade with the public enemies of his own country, as if he had remained at home; and his property, as that of an enemy, continues to be just as liable to seizure and confiscation, by an opposite belligerent. The ground of this doctrine is, that there rests, upon every subject or citizen, a moral obligation, not to abandon his country in a time of war, without the express sanction of the government. The personal services, and the property, of each separate individual, are a component part of the national resources, on which the government relies, in declaring a war; and to withdraw these, when his country may require their aid, is a breach of the duty that springs from the necessary relation that each individual bears to the political society of which he is a member. A contrary doctrine, it has been truly observed, would be inconsistent with the soundest maxims of national po-

licy, since it would enable and encourage mercantile men, at the commencement of every war, to change their residence and character, in order to exempt themselves from its necessary burdens and apprehended losses. It is for these reasons, that the principle in question has been sanctioned, by many of the most approved writers on the law of nations; and, although it has not yet been expressly affirmed, so far as I have been able to discover, by any decision of the English admiralty, I doubt not that its authority, as binding on the court, should the question arise, would be promptly admitted and followed." 1 Duer on Ins. 521, 522, § 35. See id. 547.